IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **WILLIAM PRICE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil No. 13-cv-1160-CJP**[1] |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social** ) | |
| **Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff William Price seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for benefits in May, 2010, alleging disability beginning on June 1, 1991. (Tr. 270). The date of onset was later amended to May 6, 2010, the date the application was filed. (Tr. 25). After holding an evidentiary hearing, ALJ James E. Craig denied the application in a written decision on June 17, 2013. (Tr. 25-36). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 23.

exhausted and a timely complaint was filed in this Court.   Plaintiff filed a motion

for summary judgment at **Doc. 26.**

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.    The ALJ's credibility determination was erroneous.

2.    The ALJ erred in weighing the medical opinions.

3.    The ALJ should have found that plaintiff met a Listing.

4.    The ALJ erred in determining RFC because of the first two points
      listed above.

5.    The ALJ's decision was not supported by substantial evidence due to
      the above errors.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the

applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage

in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

or can be expected to last for a continuous period of not less than 12 months."   42

U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the

4

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Mr. Price was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### <u>The Decision of the ALJ</u>

ALJ Craig followed the five-step analytical framework described above.   He determined that plaintiff had not worked since the alleged onset date.   He found that plaintiff had severe impairments of borderline intellectual functioning, depression with psychotic features, adjustment disorder, and anxiety disorder with social features.   He further determined that plaintiff's impairments do not meet or equal a listed impairment.

5

The ALJ found that Mr. Price had the residual functional capacity (RFC) to perform work at all exertional levels, limited to no complex or detailed work, tasks of three steps or less with no pace or strict quotas, only verbal instructions, no work with the general public, only occasional and intermittent contact with coworkers, and the work must be object oriented rather than people or data oriented.   He had no past relevant work.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because he was able to do jobs which exist in significant numbers in the local and national economies.

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

**1.     Termination of Prior Benefits**

Mr. Price had previously been granted SSI benefits, but his benefits were terminated when he was incarcerated.   (Tr. 297, 671).[3]

Records of the Illinois Department of Corrections indicate that Mr. Price has been incarcerated several times.   He entered the IDOC in March, 2005, to serve a six year sentence for predatory criminal sexual assault.   He was paroled in September, 2011, but returned to prison in April, 2012.   He had previously served

---

[3] Disability benefits are not payable to any person confined to a penal institution for a felony conviction.   20 C.F.R. §404.468.

a sentence for aggravated criminal sexual abuse of a victim between 13 and 16 years old.   (Tr. 288).

## 2.   Agency Forms

Plaintiff was born in 1971, and was almost 39 years old on the alleged onset date of May 6, 2010.   (Tr. 296).   He alleged disability due to a learning disability. He had not worked since 1989.   He attended school through the eighth grade.   He was in special education classes.   (Tr. 301-302).

In a Function Report, plaintiff stated that he could not read, write or count. He was "scared to be around a lot of people."   (Tr. 315).   He worked out with weights every day because he was angry.   He could only sleep for two or three hours a night.   He had learned how to use a microwave.   He cooked meals in the microwave or ate sandwiches.   His mother did his shopping.   His mother filled out the form for him.   (Tr. 315-322).

Plaintiff filed a later report in which he said he was depressed, heard voices in his head, and had thoughts of suicide.   (Tr. 333).   He said he needed help and needed medication, but had no money and no medical card.   (Tr. 336).

## 3.   Evidentiary Hearing

Mr. Price did not appear at a hearing scheduled for May 9, 2012, because he was back in prison.   His attorney explained that he had been arrested for violating his parole, but it was later determined that his actions were not a violation. However, because he was a sex offender, his living arrangements on release had to be approved by his parole officer, and that had not yet occurred.   (Tr. 46).

7

The evidentiary hearing was ultimately held on May 22, 2013.   Mr. Price was represented by an attorney.   (Tr. 35).

Plaintiff testified that he would be unable to work because he would "probably fall asleep or mess it up somehow."   (Tr. 61).   He probably would not make it to work all the time because he sometimes was able to sleep only three days out of a week.   He never left the house alone because he was afraid of people.   The last time he left the house was to go the grocery store with his wife.   They went at 1:00 a.m. because no one else would be there.   He spent his time in his room with the curtains closed.   He watched TV.   (Tr. 61-64).   He married his current wife, Melanie, in 2010.   (Tr. 69-70).

Mr. Price testified that he heard voices in his head.   The voices "cry and they say my name sometimes."   (Tr. 65).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform work at all exertional levels, limited to no complex or detailed work, tasks of three steps or less with no pace or strict quotas, only verbal instructions, no work with the general public, only occasional and intermittent contact with coworkers, and the work must be object oriented rather than people or data oriented.   The VE testified that this person could do jobs which exist in the economy.   Examples of such jobs are cloth stock sorter, bagger, and scaling machine operator.   (Tr. 72-73).

**4.    Medical Treatment**

8

The transcript contains medical records from Graham Correctional Center for the period of April 4, 2005, through April 22, 2010.   (Tr. 513-565).   A mental health evaluation in August, 2005, indicated that Mr. Price had average intelligence with no formalized thought disorders.   He denied prior mental health treatment or suicide attempts.   He said that he had been employed as a construction worker for the past two years.   The Axis I diagnoses were pedophilia, opposite sex, and alcohol abuse.   (Tr. 542).   A Health Status Transfer Summary dated April 22, 2010, indicates that plaintiff had no mental health issues.   (Tr. 513).   During his incarceration, he was prescribed only children's aspirin and cholesterol-lowering drugs.   (Tr. 546-555).

Jerry L. Boyd, Ph.D., performed a consultative psychological exam on June 8, 2010.   Plaintiff had recently been released from prison.   He was not receiving any mental health treatment and was not taking any medication.   His chief complaints were listed as "Depression.   I go to Walmart and stuff.   I can't stay in there very long."   He reported that he was last employed about 20 years ago.   Dr. Boyd noted that plaintiff appeared clean and tanned.   He was responsive to questioning.   On mental status exam, he was alert and oriented.   Attention, concentration and short-term memory showed moderate impairment.   Intelligence was estimated to be in in the borderline to mildly intellectually impaired range. Thought processes were slowed in flow, impoverished in content, but normal in form.   He had no hallucinations or delusions, and no gross signs of psychosis.   He was suspicious and untrusting, "a condition often seen in persons who have served

significant amounts of time incarcerated."   His thought processes were logical and goal-directed.       Dr.   Boyd   diagnosed   dysthymic   disorder,   alcohol   and methamphetamine dependence in reported remission, and anxiety with social features.   He concluded that Mr. Price had borderline intelligence and was a "barely adequate communicator," but he was able to follow "simple repetitive instructions."   (Tr. 566-572).

About five months after he was released from prison, Mr. Price began seeing Dr. Elbert Lee, a psychiatrist.   The first visit was on September 30, 2010. Plaintiff was referred to Dr. Lee by a counselor at Life Links.   Plaintiff told Dr. Lee that he was depressed and hearing voices.   He had difficulty sleeping and was paranoid of crowds.   He related that he had been hospitalized after a suicide attempt in 2005, and that he had a history of alcoholism with about six DUI convictions.   He was in prison from 2001 to 2004 on a sexual assault conviction, and again from 2005 to 2010 on another sexual assault conviction.   On exam, he appeared to have a "dull IQ."   His mood was moderately depressed and his affect was irritable and restricted.   The Axis I diagnoses were major depressive disorder with psychotic features, and history of alcohol dependence, in reported remission. Dr. Lee prescribed Zyprexa and Lexapro.   (Tr. 783-785).   Plaintiff returned to Dr. Lee on October 7, 2010.   He was feeling better.   He felt less depressed and the voices had decreased.   His sleep was still somewhat restless.   He denied suicidal thoughts.   Mental status exam showed he was clean and well nourished, thought process was coherent with no psychosis, his mood was less depressed, affect was

appropriate but restricted, he was alert and oriented, and his judgment and insight were marginal.    Lexapro was stopped because the doctor did not have any samples.    Celexa was prescribed instead, and the doctor noted it was "affordable for him."    His dosage of Zyprexa was increased to "help more for sleep and depression."   (Tr. 599-

Mr. Price was taken to the emergency room at Sarah Bush Lincoln Health Center in Mattoon, Illinois, on October 17, 2010, after having taken an overdose of Zyprexa.    He told the doctor that he did it to "help him think," but his fiancée said that he took them "secondary to him wanting [to] hurt himself."    He was involuntarily admitted after consultation with Dr. Lee.   (Tr. 594-595).    The next morning, plaintiff was seen in the hospital by Dr. John Lauer. Dr. Lauer noted that this was the third psychiatric admission at Sarah Bush Lincoln.    Dr. Lauer wrote that he had been diagnosed with "'schizophrenia' in the distant past." (Tr. 596). His last admission was in June of 2005.    At that time, he had recently been released from prison.    He was charged with another sexual assault, and he took "a handful of Abilify, which he had been given for his diagnosis of 'schizophrenia.'" Dr. Lauer wrote that Mr. Price "was not suicidal but was manipulating because he did not want to go to prison."    He was discharged after one day in 2005 with diagnoses of depressive disorder NOS and alcohol dependence, and he also met the criteria of antisocial personality disorder.    With regard to the current admission, plaintiff said that he took between 5 and 9 Zyprexa because he wanted to sleep.    He admitted that he may have told his girlfriend that he wanted to kill himself.

11

However, he told Dr. Lauer that he was not suicidal. He said he had been a little depressed and paranoid. Under past medical history, Dr. Lauer noted "History of multiple overdoses in the past – mainly for manipulation." Dr. Lauer diagnosed depressive disorder NOS, and alcohol dependence in reported remission. He assigned Axis II diagnoses of learning disorder NOS and antisocial personality disorder. He concluded that plaintiff did not meet the criteria for second certification for involuntary admission. He wrote that plaintiff had a "long history of impulsivity and manipulation. Most likely his overdose last night was a combination of both." He was discharged to home on Thorazine and Celexa, and directed to follow up with Dr. Lee. (Tr. 596-598).

Mr. Price saw Dr. Lee on October 20, 2010. Plaintiff denied that he had tried to kill himself, saying he took too many Zyprexa "to get sleep." He had not filled the Thorazine prescription. He was still hearing voices, and his mood was depressed. He said he felt paranoid at times. Mental status exam was the same as it had been on the last visit, except that he was occasionally hearing voices and noises. Dr. Lee concluded that he was not actively suicidal. He prescribed Invega and continued Thorazine and Celexa. (Tr. 602-604). On October 27, 2010, plaintiff was doing better. The voices were just whispers "and are not bothersome." He was able to control his behavior and was sleeping well. He was living with his girlfriend "who has disability." They got along well and had a good relationship. His medications were continued. (Tr. 605-607). At the next visit, on November 10, 2010, he had lost some Celexa pills and had not taken them for

12

three days.   He was feeling "edgy" and depressed.   The voices were "more muted and tolerable."   Mental status exam results were the same.   He was stable.   (Tr. 608-610).

He returned to Dr. Lee on December 21, 2010, and reported that he was feeling better.   His mood was "okay," he was sleeping better and the voices had decreased.   (Tr. 638-640).

Plaintiff was assessed for counseling services at Cumberland Associates in January, 2011.   He was having difficulty adjusting to life outside of prison and to being married.   He "indicated he would like to work but is having difficulty finding a job due to his criminal background and parole status."   (Tr. 628).   He transferred to another agency for services.   (Tr. 626).

Plaintiff saw Dr. Lee again on February 1, 2011.   He reported that his sleep was restless at times, and he still occasionally heard voices.   He had some paranoia that people might try to hurt him.   On exam, he was clean and well nourished.   His thought process was coherent, but he did occasionally hear voices. He was mildly depressed.   Judgment and insight were marginal.   Dr. Lee adjusted his medications.   (Tr. 635-636).

Plaintiff received counseling services from Heartland Human Services beginning in February, 2011.   In February, March and April, he was noted to be clean.   He reported difficulties in his relationship with his wife.   (Tr. 684-686).

In March and April, 2011, Dr. Lee noted that he was much the same.   He was continuing to hear voices, feel depressed and have difficulty sleeping.   His

medications were again adjusted.   On both of these visits, Dr. Lee noted that plaintiff was clean and well-nourished, speech was normal, thought process was coherent, mood was mildly depressed, affect was appropriate but restricted, judgment and insight were marginal, he was occasionally hearing voices, and he was not suicidal or homicidal.   (Tr. 692-704).

Mr. Price went to the emergency room at Sarah Bush Lincoln Health Center in Mattoon, Illinois, on April 15, 2011.   He was out of his medications.   He had seen Dr. Lee ten days earlier, but had not told Dr. Lee that he was out of his medications.   He was hearing voices that were whispers, and he had some suicidal thoughts.   His visit to the emergency room was precipitated by an argument with his wife.   His wife had called her father, who had called the police.   Mr. Price was on parole and was wearing an electronic monitoring device on his ankle.   The emergency room doctor spoke with Dr. Lee, and Regional Behavior Health assessed both plaintiff and his wife.   It was determined that they did not need to be admitted.   (Tr. 687-688).

Mr. Price saw Dr. Lee in his office on April 19, 2011.   His Medicaid coverage had been discontinued, and he was unable to afford his medications.   He was hearing more voices, but denied suicidal ideation.   He was sleeping poorly and was restless and depressed.   Dr. Lee gave him some samples of Latuda to treat psychosis and of Oletro to treat psychosis and depression.   (Tr. 697-699).   On April 25, 2011, plaintiff reported that Latuda made him feel restless.   Dr. Lee substituted Geodon.   (Tr. 701-703).   On June 1, 2011, plaintiff reported that

14

Geodon was making him nauseous, so he stopped taking it. He was hearing increased voices and getting anxious since then. Dr. Lee again prescribed Latuda, and continued Trazodone. (Tr. 712-713). Two weeks later, plaintiff was doing better. Latuda reduced his voices, paranoid ideations and delusion. His mood was slightly depressed, but stable. His thought process was organized and relevant. He was sleeping well. (Tr. 715). In July, 2011, he was continuing to do well on Latuda, but had occasional angry outbursts and irritability. Dr. Lee added a mood stabilizer, Tegretol. (Tr. 718-720).

In October, 2011, Dr. Lee noted that plaintiff's condition was "about the same." He was slightly depressed and his sleep was occasionally restless. Tegretol helped with his angry outbursts. On mental status exam, Dr. Lee noted that plaintiff was clean and well-nourished, speech was normal, thought process was coherent, mood was mildly depressed, affect was appropriate but restricted, judgment and insight were marginal, he was occasionally hearing voices, and he was not suicidal or homicidal. (Tr. 722-724).

Mr. Price saw Dr. Lee on December 19, 2011. This was the last visit before Dr. Lee filled out a Mental Functional Capacity Report. Plaintiff was still taking Latuda, Trazodone and Tegretol. As on previous visits, Dr. Lee noted that plaintiff was clean and well-nourished, speech was normal, thought process was coherent, mood was mildly depressed, affect was appropriate but restricted, judgment and insight were marginal, he was occasionally hearing voices, and he was not suicidal

or homicidal.   He was compliant with his medications and was tolerating his medications well.   (Tr. 726-729).

Mr. Price was evaluated at Human Resources Center of Edgar and Clark Counties on February 1, 2012.   A Qualified Mental Health Professional completed a lengthy assessment form.   Plaintiff stated that he came to the agency "just to talk to somebody."   He stated that he did not like people and felt that people judge him about his past.   He had been an alcoholic and drug addict, and had committed sex crimes.   He heard people crying and laughing and saying his name.   He reported that he "gets pretty angry and is afraid that he will 'snap' on somebody."   He said that he heard voices for "a long time" before he went to prison in 2002.   (Tr. 758).   He did not "appear to remember his past diagnosis, but is fixated on the diagnosis of Schizophrenia."   He said that he would sleep for long periods and then stay awake for long periods.   (Tr. 760).   He stopped using alcohol, meth and cannabis when he went to prison at the age of 29 or 30.   He had 6 or 7 DUIs and had not had a driver's license since he was about 25.   (Tr. 762-763).   He had 2 adult sons and 2 adult daughters.   He was not supposed to have contact with one of his daughters because she was the victim of one of his sexual abuse crimes.   He had abused his daughter 13 or 14 years ago.   His wife had minor children, but they were not in her custody because of her criminal history.   He could not have contact with his minor stepchildren because of the conditions of his parole.   (Tr. 765-768).   Mr. Price reported that his "fear of being around people" prevented him from working.   In addition, he was on "house arrest for sexual assault."   He had 1 year left of parole.

16

He reported that he was "not able to find employment due to his convictions and being on house arrest." (Tr. 768-770). Mental status exam revealed that his memory was within normal limits, he had mild problems with attention and information, and moderate problems with judgment. His mood was anxious, and his thought processes and thought content were within normal limits. He reported that he heard voices. (Tr. 770-771). He reported that he was "unable to work due to his house arrest." (Tr. 773). The Axis I diagnoses were major depressive episode, recurrent, severe with psychotic features, and adjustment disorder with mixed anxiety and depressed mood. (Tr. 777).

Dr. Lee continued to see Mr. Price in 2012. Because plaintiff was still depressed and sleeping during the day and during the night, he took him off Tegretol and prescribed Lithium. However, Lithium made him sick, so Dr. Lee prescribed Celexa instead. (Tr. 740-744). On February 22, 2012, plaintiff was less depressed and was more active. His sleep cycle was reversed, so Dr. Lee prescribed melatonin. As on previous visits, Dr. Lee noted that plaintiff was clean and well-nourished, speech was normal, thought process was coherent, mood was mildly depressed, affect was appropriate but restricted, judgment and insight were marginal, and he was not suicidal or homicidal. There is no note that he was hearing voices. (Tr. 746-748). On March 1, 2012, he was stable. He occasionally got irritable. His mood was okay and he had no delusions. His medications were continued. (Tr. 749-752). On April 2, 2012, Dr. Lee noted that plaintiff remained stable. His mood was mildly depressed. His sleep was

17

occasionally restless, but was okay on other days.   He occasionally heard voices, but Latuda reduced the voices and "they do not bother him."   (Tr. 753-755).

He was discharged from treatment because he was returned to prison in April, 2012.   The Human Resource Center's note indicates that he was having "intense conflict" with his wife, and he was found walking along Route 40 without permission for movement.   The note also indicates that mental health treatment had been mandated by the IDOC as a condition of his parole.   (Tr. 780-781).

The transcript contains records from Graham Correctional Center for the period of April 11, 2012, through February 23, 2013.   (Tr. 795-845).   A mental health evaluation was done on April 11, 2012.   Plaintiff said that he had been treated for schizophrenia in the past.   He said that he tried to kill himself by taking pills about two years earlier.   He had no recent thoughts of self-harm.   He said he was depressed, anxious, and had difficulty concentrating.   He was referred to the prison psychiatrist.   (Tr. 798).

The prison psychiatrist saw plaintiff at regular intervals.   He prescribed chlorpromazine (Thorazine).   The initial diagnosis was psychosis, NOS, rule out schizophrenia.   (Tr. 813).   On April 28, 2012, his mood was within normal limits, affect was normal, he had auditory hallucinations but "no command 'noise.'"   His thought processes were logical and coherent, and his attention was focused. Thought content was unremarkable.   Grooming was appropriate.   He spent his days writing letters, pacing in his room or hallway, and talking to others.   He was experiencing anxiety due to recent parole violation.   (Tr. 814).   On May 3, 2012,

18

he reported that his hallucinations were not as bad.   He said that his medications were working.  (Tr. 816).  His medications were adjusted in June, 2012.  (Tr. 817).   In February , 2013, he reported that he felt "pretty good" on his medications, but reported that he was crying "all the time."   His hallucinations were decreased. He did not feel hopeless or helpless.  He did not have any visual hallucinations, paranoia, thought control or delusional/referential thinking.   His GAF was assessed at 68.   The diagnoses were "schizoaffective – depressed, r/o LD NOS." (Tr. 822).

Mr. Price returned to Heartland Human Services after his release from prison.  He was seen in March and April, 2013, for 3 visits.  He said he was scheduled to see a new psychiatrist, Dr. Sharon Szatkowski, in May, 2013.  (Tr. 846).   It was noted that his drug history report "may not be accurate – it does not match his previous assessment."   (Tr. 848).   His reason for seeking treatment was "maybe you guys could help me understand why I'm scared of people, and, hopefully help me get my check for disability."  (Tr. 856).   On the first and third visits, he was described as "neat and casual" and "clean and casually dressed."   On the second visit, his "clothing did not look fresh and there was a slight odor."   (Tr. 869-871).

Plaintiff saw Dr. Szatkowski on May 7, 2013.   The record contains only an order for lab work.   There is no office note. (Tr. 872).

**5.    Dr. Lee's Opinion**

Dr. Lee completed his report on December 27, 2011. For "impairment/diagnosis," Dr. Lee wrote "hears voices, depressed." The form asked the doctor to rate plaintiff's impairments on a scale of 1 to 5, with 3 being moderate and 4 being marked. Dr. Lee rated plaintiff as having moderate limitations in activities of daily living, and marked limitations in social functioning and in maintaining concentration, persistence and pace. He indicated that plaintiff had 3 episodes of decompensation in the last 12 months, and would be likely to miss work because of his impairments or treatment about 3 times a month. (Tr. 730-731).

**6.      State Agency RFC Assessment**

In August, 2010, state agency consultant Russell Taylor, Ph.D., assessed plaintiff's mental RFC based on a review of the records. He indicated that plaintiff was not significantly limited in his ability to understand and carry out short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions and complete a normal workweek without interruptions from psychologically based symptoms. He had moderate limitations in areas involving detailed instructions, maintaining attention and concentration for extended periods, and working with other people. In his narrative remarks, Dr. Taylor stated that plaintiff "retains the mental capacity to understand, remember and concentrate well enough to carry out simple tasks for a normal work period." He should, however, be limited to reduced involvement with the general public and be in a work setting with reduced social demands. Dr. Taylor noted

20

that plaintiff had worked in construction for 2 years prior to his incarceration. (Tr. 573-576).

### 7.    Evidence Not Before the ALJ

The transcript contains medical records that were not before the ALJ.   As of the time the ALJ issued his decision, the medical records consisted of Exhibits 1F through 30F, i.e., Tr. 504 through 872.   See, Tr. 41-43.   Plaintiff submitted the additional records to the Appeals Council, which considered them in connection with his request for review.   See, Tr. 5.   Thus, the medical records at Tr. 873-882, designated by the Appeals Council as Exhibit 31F, were not before the ALJ.

The medical records at Tr. 873-882 cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error." *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994).   See also, *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008);   *Rice v. Barnhart*, 384 F.3d 363, 366, n. 2 (7th Cir. 2004).

The Court notes that plaintiff improperly cites to the records that were not before the ALJ in support of his arguments.   See, Doc. 26, pp. 22, 26.

### Analysis

Plaintiff first argues that the ALJ's credibility analysis was erroneous.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the

witness.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case."   *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.  Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."   *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

The ALJ is required to give "specific reasons" for his credibility findings and to analyze the evidence rather than simply describe the plaintiff's testimony. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).   See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir., 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.")   The ALJ may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration."   *Getch v.*

22

*Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).   However, if the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

ALJ Craig gave a number of reasons for his credibility findings.   Noting that plaintiff testified that he could not work because he would fall asleep or make mistakes, the ALJ said that there was "little evidence from treating sources" to show that Mr. Price had either daytime somnolence or that his medications made him severely drowsy.   He said that plaintiff's was able to do simple tasks such as prepare simple meals and perform yard work, indicating that he would not be likely to "make mistakes of the degree that would preclude all work."   He noted that Mr. Price sought treatment after his most recent release from prison "in part, to get help in getting disability."   He alleged social anxiety and that he rarely left the house, but he was on house arrest, had no license due to multiple DUIs, and "his perception of negative interaction with others was not unreasonable given his criminal history." The ALJ pointed out that Mr. Price stated in January, 2011, that "he did not think he could find a job due to his sex offender status and parole status."   Further, the records of Sarah Bush Lincoln indicated that he had a history of multiple overdoses for manipulative purposes.   A psychiatric exam in February, 2013, while he was in prison, assessed only mild limitations in functioning.   Lastly, his condition improved with medication.   (Tr. 30-31).

Plaintiff's attacks on the ALJ's reasons are unavailing.   He argues that his mother and wife said that he slept during the day, and that Dr. Lee addressed sleep issues throughout his treatment.   However, plaintiff's mother and wife are not treating sources, and, while Dr. Lee did address sleep issues, the ALJ noted that Dr. Lee documented improvement in plaintiff's condition with medication.   See, Tr. 32.

Plaintiff takes issue with the ALJ's reliance on the fact that he sought treatment after his most recent incarceration in part to seek help in getting back on disability.   However, this is an accurate reading of the record.   See, Tr. 856. Further, the terms of plaintiff's parole required that he participate in mental health counseling.   See, Tr. 439, 780-781.   Plaintiff's argument that he was primarily motivated to seek treatment by a desire to get better is therefore not supported by the record.

Plaintiff suggests that the ALJ failed to explain why he concluded that plaintiff was found to have only mild limitations in February, 2013.   He is incorrect.   The ALJ explained this conclusion at Tr. 34 when he stated that plaintiff was assessed with a GAF of 68 in February, 2013, indicating mild limitations in functioning.

Plaintiff calls the ALJ's rationale regarding his social anxiety "deeply flawed." This Court disagrees.   The ALJ could reasonably conclude that plaintiff's isolation at home resulted more from the fact that he was on house arrest than from his mental limitations.   Contrary to plaintiff's argument, the fact that he was probably

24

correct in assuming that people would react negatively to him because he is a sex offender does not bolster the credibility of his claims.   Rather, it suggests that he avoided contact with people for a rational reason, and not because of any mental limitations.

The ALJ also noted plaintiff's statement that he did not think he could find a job because he was a sex offender and on parole.   See. Tr. 31.   The ALJ could reasonably conclude that plaintiff's unemployment was due to his inability to find a job and not due to disability.   However, "supplemental security income is not a form of unemployment insurance and is unavailable if any do-able work exists in the national economy, even if other persons with better skills are likely to be hired instead."   *Donahue v. Barnhart*, 279 F.3d 441, 443 (7th Cir. 2002).

Plaintiff also argues that the ALJ misstated the record with regard to his hospitalization for an overdose in October, 2010.   It is true that the ALJ was not entirely clear in distinguishing between the doctor's recitation of past history of a 2005 overdose and the circumstances of the 2010 overdose.   However, the ALJ's main point was clear and accurate: Dr. Lauer characterized the 2010 overdose as a manipulative attempt, and stated that plaintiff had a "History of multiple overdoses in the past – mainly for manipulation."   (Tr. 596-597).

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong."   *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).   The analysis is deemed to be patently wrong "only when the ALJ's determination lacks any explanation or support."   *Elder v. Astrue*, 529 F.3d 408,

25

413-414 (7th Cir. 2008).   In reviewing the ALJ's credibility determination, the Court "give[s] the opinion a commonsensical reading rather than nitpicking at it." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010)(internal citations omitted).

Here, the analysis is far from patently wrong.   It is evident that ALJ Craig considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony.   *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).   Plaintiff's arguments are no more than nitpicking and are not supported by the record.   Therefore, the credibility determination stands.

Plaintiff's only other developed point is that the ALJ erred in weighing the medical opinions.   His argument about the ALJ's consideration of whether he met a Listing is undeveloped and therefore will not be considered.   *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).   And, his point about the RFC assessment and lack of substantial support are derivative of his other points.

Mr. Price argues that the ALJ should have given more weight to Dr. Lee's opinion.   The opinions of treating doctors are to be evaluated under 20 C.F.R. §404.1527.   Obviously, the ALJ is not required to accept a treating doctor's opinion; "while the treating physician's opinion is important, it is not the final word on a claimant's disability."   *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).   If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527.   Supportability and consistency are two important factors to be considered in weighing medical opinions.   See, 20 C.F.R. §404.1527(d).   In a nutshell, "[t]he regulations state that

26

an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

The ALJ must be mindful that the treating doctor has the advantage of having spent more time with the plaintiff but, at the same time, he may "bend over backwards" to help a patient obtain benefits. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). See also, *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

When considered against this backdrop, the Court finds no error in the ALJ's weighing of Dr. Lee's opinion.   An ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of another physician, internally inconsistent, or inconsistent with other evidence in the record.   *Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. 2012); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).   Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).   Here, the ALJ relied on the fact that Dr. Lee's treatment notes did not support his opinion, plaintiff's reports to his doctors about his symptoms

27

were not credible because he was manipulative and sought treatment in part to get back on disability, and his opinion was inconsistent with other evidence.   The Court finds that ALJ Craig more than met the minimal articulation standard here.

Plaintiff argues that the ALJ did not articulate how Dr. Lee's opinion is not supported by his records.   This argument ignores the detailed discussion of Dr. Lee's records at Tr. 32.   Notably, Dr. Lee stated that plaintiff had three episodes of decompensation in the last twelve months, an assertion which is clearly not supported by his records.   Similarly, plaintiff ignores the record in arguing that the ALJ incorrectly relied on his history of manipulation and the fact that he sought treatment in part to get back on disability.   And, his argument that Dr. Boyd found severe limitations, including reduced persistence, refers to Dr. Boyd's exam in connection with plaintiff's prior application.   See, Tr. 504-512.   Dr. Boyd did not make those findings in his exam done in connection with the current application.

Plaintiff calls the ALJ's recognition that Dr. Pan found only mild limitations in February, 2013, "patently ridiculous" because Dr. Pan diagnosed schizophrenia, a diagnosis not accepted by the ALJ.   This argument misses the point.   Regardless of his diagnosis, Dr. Pan found only mild limitations.   A finding of only mild limitations contradicts Dr. Lee's opinion.   Plaintiff also argues that the ALJ failed to consider evidence that he had a chaotic and stressful home life, but that is not a basis for finding disability.   In short, plaintiff has not demonstrated that the ALJ erred in discounting Dr. Lee's opinion.

28

In the final analysis, plaintiff's arguments are a plea to the Court to reweigh the evidence, which is far beyond this Court's proper role.   The most that can be said is that reasonable minds could differ as to whether Mr. Price was disabled during the relevant time period.   In that circumstance, the ALJ's decision must be affirmed if it is supported by substantial evidence.   And, the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence.   *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Craig committed no errors of law, and that his findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying William Price's application for disability benefits is **AFFIRMED**.

Plaintiff's motion for summary judgment **(Doc. 26)** is **DENIED**.

The Clerk of Court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   February 5, 2015.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

29